Slip Op. 07-135

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHINA KINGDOM IMPORT & EXPORT CO., LTD.; YANCHENG YAOU SEAFOOD CO., LTD.; and QINGDAO ZHENGRI SEAFOOD CO., LTD.**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant. | **Before: Timothy C. Stanceu, Judge** <br><br> **Court No. 03-00302** |

## OPINION AND ORDER

[Granting in part and denying in part plaintiffs' motion for judgment upon the agency record contesting the application of facts otherwise available and adverse inferences to all entries of merchandise of plaintiffs China Kingdom Import & Export Co., Ltd. and Yancheng Yaou Seafood Co., Ltd. that were subject to the final results of an antidumping duty administrative review]

Dated: September 4, 2007

*Garvey Schubert Barer* (*William E. Perry*, *Lizbeth R. Levinson*, and *Ronald M. Wisla*) for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); *Marisa B. Goldstein*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stanceu, Judge: Plaintiffs China Kingdom Import & Export Co., Ltd. ("China Kingdom"), Yancheng Yaou Seafood Co., Ltd. ("Yancheng"), and Qingdao Zhengri Seafood Co., Ltd. ("Qingdao") (collectively "plaintiffs") contest the April 2003 final results of an administrative review of a 1997 antidumping duty order on imported freshwater crawfish tail meat ("Final Results"). *See Freshwater Crawfish Tail Meat from the People's Republic of*

*China; Notice of Final Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 19,504 (Apr. 21, 2003) ("*Final Results*"). The Final Results, issued by the International Trade Administration, United States Department of Commerce ("Commerce" or the "Department"), pertain to freshwater crawfish tail meat imported from the People's Republic of China ("China" or the "PRC") that was subject to the antidumping duty order (the "subject merchandise") and entered for consumption during the period of September 1, 2000 through August 31, 2001 (the "period of review" or "POR"). *Id.* at 19,504-05.

Plaintiffs argue that Commerce exceeded its authority, and failed to support its decision with substantial record evidence, when it applied the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e(a) and (b), respectively, in determining an antidumping duty assessment rate of 223.01 percent for China Kingdom and in subjecting Yancheng to the "PRC-wide" rate, which also is 223.01 percent.[1] *See* Am. Br. in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R. 2-5 ("Pls.' Am. Br."). Invoking these provisions, Commerce rejected all data that China Kingdom and Yancheng had submitted during the administrative review in response to the Department's information requests. *See Final Results*, 68 Fed. Reg. at 19,506; 19 U.S.C.§§ 1677e(a)-(b), 1677m(d)-(e) (2000).

Commerce applied facts otherwise available and adverse inferences in determining the antidumping duty assessment rate for China Kingdom based on its finding that China Kingdom erroneously submitted, in its response to the Department's questionnaire, certain information

---

[1] Commerce uses the term "total adverse facts available" to refer to the application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e in determining the antidumping duty assessment rate for all of a respondent's entries upon rejection of all information submitted by the respondent during an investigation or review. *See Final Results*, 68 Fed. Reg. at 19,506.

provided to it by its crawfish tail meat producer that did not pertain to the period of review but instead pertained to a prior time period. The data affected by the error were data used in calculating the normal value of the merchandise according to procedures set forth in 19 U.S.C. § 1677b(c) (2000), which are applicable to merchandise produced in nonmarket economy countries. Specifically, the affected data were data on the producer's total production of crawfish tail meat and data pertaining to eight of the eleven factors of production. *Final Results*, 68 Fed. Reg. at 19,506; *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China: September 1, 2000 through August 31, 2001* at 22-25 (Apr. 14, 2003) (Public Admin. R. Doc. No. 259) ("*Decision Mem.*"). When China Kingdom attempted to remedy the deficiency by providing Commerce a submission with corrected data at the outset of the phase of the verification occurring at the location of its producer, Chaohu Daxin Foodstuff Co., Ltd. ("Daxin"), Commerce terminated the verification. *Decision Mem.* at 20, 22-25. Commerce rejected the substitute data, considering it to be new information that was unacceptable if submitted after the deadline set forth in its regulations. *Id.* Commerce found, for purposes of 19 U.S.C. § 1677e(b), that China Kingdom did not act "to the best of its ability" in providing the requested information. *Id.* On this basis, Commerce declined to use any of the information submitted by China Kingdom relevant to the antidumping duty assessment rate and, as an adverse inference, assigned to China Kingdom the assessment rate of 223.01 percent, which was the highest rate determined for any respondent in the administrative review. *Final Results*, 68 Fed. Reg. at 19,506; *see* 19 U.S.C. § 1677e(b).

The court concludes, for the reasons discussed herein, that Commerce failed to make and support with substantial evidence findings on which to base its decision to resort to facts otherwise available under 19 U.S.C. § 1677e(a)(2) and that Commerce exceeded its authority when it rejected all data submitted by China Kingdom that were relevant to the calculation of an antidumping duty assessment rate. The court concludes that Commerce also acted contrary to law in assigning to China Kingdom, as an adverse inference pursuant to 19 U.S.C. § 1677e(b), an antidumping duty assessment rate of 223.01 percent.

Commerce also applied facts otherwise available and adverse inferences in subjecting Yancheng to the 223.01 percent rate assigned to respondents who failed to establish independence from control of the government of the PRC (the "PRC-wide rate") determined in the administrative review. *Final Results*, 68 Fed. Reg. at 19,506. Commerce based its determination principally on its conclusion that Yancheng and its corporate affiliate, Qingdao, should be treated as a single entity for purposes of the review and its finding that Qingdao had failed to cooperate to the best of its ability when it refused to allow the Department to conduct a verification of its submitted information. *Decision Mem.* at 16-17. Although Yancheng consented to verification, Commerce refused to conduct a verification only of Yancheng, reasoning that under those circumstances Commerce was precluded from accomplishing a satisfactory verification of the single entity comprised of Yancheng and Qingdao. *Id.* at 17-18. In the absence of sufficient verified information, Commerce concluded that the Yancheng-Qingdao entity had not been shown to be free of control by the government of the PRC, that Commerce could not calculate for that entity a separate antidumping duty assessment rate and,

accordingly, that the entries of Yancheng's subject merchandise should be subjected to the PRC-wide rate. *See id.* 16-20.

For the reasons discussed herein, the court concludes that Commerce acted in accordance with law in refusing to subject to the verification procedure the information submitted by Yancheng after Qingdao notified Commerce that Qingdao would not participate in verification. Yancheng and Qingdao did not contest, either in the administrative review or before the court, the Department's decision to treat them as a single entity. In the absence of verification of the business records of Qingdao, the Department's finding that it was unable to accomplish a satisfactory verification of the single entity Yancheng-Qingdao was supported by substantial evidence. *Decision Mem.* at 17-18. Lacking sufficient verified information pertaining to the single entity, Commerce acted in accordance with law in concluding that it was unable to determine for that single entity a separate antidumping duty assessment rate. The court, therefore, affirms the Department's determination to include Yancheng in the 223.01 percent PRC-wide rate determined for the review.

The court remands this matter to Commerce with instructions to redetermine the antidumping duty assessment rate for China Kingdom in conformity with this Opinion and Order.

## I. BACKGROUND

Commerce issued its antidumping duty order on freshwater crawfish tail meat from China in 1997. *See Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Sept. 15, 1997) ("*Order*"). Approximately four years later, Commerce

announced the opportunity to request the administrative review at issue in this case. *See*

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity*

*To Request Administrative Review*, 66 Fed. Reg. 46,257 (Sept. 4, 2001). China Kingdom and

Qingdao, exporters of freshwater crawfish tail meat to the United States, timely requested an

administrative review. *Letter from Garvey Schubert Barer to Sec'y of Commerce* (Sept. 28,

2001) (Public Admin. R. Doc. No. 2). Domestic interested parties also timely requested an

administrative review of Yancheng and certain other producers and exporters of freshwater

crawfish tail meat from China. *Letter from Adduci, Mastriani & Schaumberg, L.L.P. to Sec'y of*

*Commerce* (Sept. 28, 2001) (Public Admin. R. Doc. No. 3). In response to the requests,

Commerce initiated the administrative review at issue.[2] *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 66 Fed. Reg.

54,195 (Oct. 26, 2001).

In the preliminary results of the administrative review ("Preliminary Results"), and again

in the Final Results, Commerce invoked facts otherwise available and adverse inferences in

assigning China Kingdom an antidumping duty assessment rate of 223.01 percent. *Freshwater*

*Crawfish Tail Meat from the People's Republic of China*: *Notice of Preliminary Results of*

*Antidumping Duty Administrative Review*, 67 Fed. Reg. 63,877, 63,880 (Oct. 16, 2002)

---

[2] Subsequently, domestic interested parties timely withdrew their requests for a review of Yancheng and China Kingdom but clarified that the respondents still subject to review included Qingdao. *Mem. from Case Analyst to Director, Office of AD/CVD Enforcement VII* at 1-2 (June 3, 2002) (Public Admin. R. Doc. No. 109). As China Kingdom submitted its own request for review, Commerce did not rescind that administrative review. *Id.* at 2. Commerce did not rescind the review of Yancheng, explaining that it treated Yancheng and Qingdao as a single entity and that the review of Qingdao was requested by domestic interested parties and Qingdao itself. *Id.* Plaintiffs do not challenge the Department's action of continuing the review of Yancheng.

("*Preliminary Results*"); *Final Results*, 68 Fed. Reg. at 19,506.  As a result of the Department's

conclusion that Yancheng did not qualify for a separate rate, Yancheng, in the Preliminary and

the Final Results, was subjected to the 223.01 percent rate as the PRC-wide rate.  *Preliminary*

*Results*, 67 Fed. Reg. at 63,880; *Final Results*, 68 Fed. Reg. at 19,506.

   A.  The Inclusion of Incorrect Producer's Data in China Kingdom's Questionnaire Response

        In its questionnaire response, China Kingdom submitted to Commerce certain data

provided to it by its producer, Daxin, that pertained, at least in part, to a time period prior to the

period of review.  *Letter from Office of AD/CVD Enforcement VII, Import Admin., Dep't of*

*Commerce to Garvey Schubert Barer* at 1 (Aug. 28, 2002) (Public Admin. R. Doc. No. 169)

("*Letter Rejecting Information as Untimely*"); *see also Letter from Garvey Schubert Barer to*

*Sec'y of Commerce*, Section D (Feb. 27, 2002) (Confidential Admin. R. Doc. No. 9); *Letter from*

*Garvey Schubert Barer to Sec'y of Commerce*, Section D (Feb. 28, 2002) (Public Admin. R. Doc.

No. 52) ("*China Kingdom Questionnaire Resp.*").  The data were required for the calculation of

normal value of the subject merchandise according to the procedures of 19 U.S.C. § 1677b(c),

under which Commerce determines normal value for goods produced in nonmarket economy

countries.  *See* 19 U.S.C. § 1677b(c).  The calculation of normal value is based, in part, on the

value of factors of production, including labor, raw materials, utilities, and representative capital

cost, utilized in producing the subject merchandise.  *Id.* § 1677b(c)(3).  Commerce values the

factors of production according to prices and costs of factors of production in a market economy

country at a level of development comparable to the nonmarket economy country.  *Id.*

§ 1677b(c)(4).

Upon discovering the error at the beginning of the phase of the verification process that was conducted at the site of China Kingdom's producer, Daxin, China Kingdom attempted to file a submission with substitute data, which it described as pertaining to the period of review. The substitute data pertained to the calculation of normal value with respect to eight of the eleven factors of production used to produce the subject merchandise and also supplied a new figure for Daxin's total production of the subject merchandise during the period of review.[3] *Letter from Garvey Schubert Barer to Sec'y of Commerce* at 1-2 (Aug. 13, 2002) (Confidential Admin. R. Doc. No. 49) (placing on the record the exhibits containing the substitute information and requesting public comment); *Letter from Garvey Schubert Barer to Sec'y of Commerce* at 1-2 (Aug. 14, 2002) (Public Admin. R. Doc. No. 165) (placing on the record the public version of the August 13, 2002 letter and exhibits of substitute information) ("*Letter With Corrected Exhibits*"); *see also Letter from Garvey Schubert Barer to Sec'y of Commerce* (Aug. 14, 2002) (Public Admin. R. Doc. No. 166) (explaining that "7 of a total 13 containers of subject merchandise shipped by China Kingdom were in fact produced by Daxin in 2000" and that "[t]his formed the basis for reporting 2000 data in Daxin's section D questionnaire response.") ("*Letter Explaining Deficiency in Prod. Data*").

When China Kingdom notified the Department's verification team of the error affecting Daxin's production-related data, the verification team stopped the verification and contacted Commerce officials in Washington. *Antidumping Duty Administrative Review of Freshwater*

---

[3] The eight factors of production affected by the erroneous data were whole crawfish, scrap by-product, direct labor, indirect labor, packing labor, electricity, coal, and water. Unaffected were the data for the factors of production consisting of tape, boxes, and bags. *Decision Mem.* at 23-24.

*Crawfish Tail Meat from the People's Republic of China: Verification Report for China*

*Kingdom Import & Export Co., Ltd.* at 10 (Sept. 16, 2002) (Public Admin. R. Doc. No. 173)

("*China Kingdom Verification Report*").  Commerce officials instructed the verification team to

terminate the verification of China Kingdom, return the exhibits pertaining to the Daxin segment

of the verification, and collect documentation sufficient to demonstrate that China Kingdom had

submitted data on total crawfish tail meat production, and data on eight of the eleven factors of

production, that pertained to a period prior to the period of review.  *Id.*  Commerce refused to

accept the substitute submission, considering it an untimely filing of new factual information.  *Id.*

at 1, 10; *Letter Rejecting Information as Untimely* at 1; *see also Preliminary Results*, 67 Fed.

Reg. at 63,879.

In the Preliminary Results, on the basis of facts otherwise available and adverse

inferences, Commerce preliminarily assigned an antidumping duty assessment rate of 223.01

percent to China Kingdom, which was the highest rate assigned to any producer or exporter in

both the contested and previous administrative review and was equivalent to the PRC-wide rate.

*See Preliminary Results*, 67 Fed. Reg. at 63,879-80, 63,885.  After considering comments

submitted in response to the Preliminary Results, Commerce, in the Final Results, affirmed its

findings that China Kingdom did not timely file certain information related to factors of

production and failed to act to the best of its ability to comply with the Department's requests for

information.  *Final Results*, 68 Fed. Reg. at 19,506; *see also Decision Mem.* at 22-25.

Commerce also affirmed its determination that the application of facts otherwise available and

adverse inferences was appropriate.  *Final Results*, 68 Fed. Reg. at 19,506.  Commerce again

assigned to China Kingdom's entries a rate of 223.01 percent.  *Id.*

### B.  The Department's Treatment of Yancheng and Qingdao as a Single Entity and the Refusal by Qingdao to Participate in the Verification Process

During the review of Yancheng, Yancheng and Qingdao disclosed, in their consolidated responses to the Department's questionnaires, that they "are related through a Hong Kong company that owns significant shares in both companies."  *See Preliminary Results*, 67 Fed. Reg. at 63,878; *see also Letter from Garvey Schubert Barer to Sec'y of Commerce*, Section A Resp. at 1 (Mar. 12, 2002) (Public Admin. R. Doc. No. 56); *Letter from Garvey Schubert Barer to Sec'y of Commerce*, Section A at 1 (Mar. 12, 2002) (Public Admin. R. Doc. No. 57).  Yancheng and Qingdao also furnished consolidated responses to three supplemental questionnaires.  *See Letter from Garvey Schubert Barer to Sec'y of Commerce* (May 15, 2002) (Public Admin. R. Doc. No. 88); *Letter from Garvey Schubert Barer to Sec'y of Commerce* (June 5, 2002) (Public Admin. R. Doc. No. 112); *Letter from Garvey Schubert Barer to Sec'y of Commerce* (July 3, 2002) (Public Admin. R. Doc. No. 131).

Prior to the verification process, Yancheng and Qingdao notified Commerce that Qingdao would not take part in the verification process due to financial difficulties.  *See Letter from Garvey Schubert Barer to Sec'y of Commerce* (June 4, 2002) (Public Admin. R. Doc. No. 111). In the same letter, Yancheng and Qingdao informed Commerce that Yancheng "is willing to participate in verification and welcomes the Department to their facilities to verify their questionnaire responses."  *Id.*  Commerce responded on August 2, 2002 that because Qindao and Yancheng's responses to sections A, C, and D of the questionnaires had been consolidated, non-participation of Qingdao in verification would preclude the Department from verifying any of Yancheng's information in the consolidated submissions.  *Letter from Sec'y of Commerce to*

*Garvey Schubert Barer* (Aug. 2, 2002) (Public Admin. R. Doc. No. 153) ("*Commerce Resp. to*

*Qingdao Non Participation*").

Commerce notified Yancheng and Qingdao that it would treat Yancheng and Qingdao as

a single entity in the administrative review. *Id.*; *see* 19 C.F.R. § 351.401(f)(1) (2002) (setting

forth the regulation on "affiliated producers"). Commerce based its decision on a Hong Kong

company's common interest in both Yancheng and Qingdao, on record information establishing

the consolidation by that Hong Kong company of the selling activities of Yancheng and Qingdao,

and on the consolidation of Yancheng's and Qingdao's questionnaire responses.[4] *Freshwater*

*Crawfish Tail Meat from the People's Republic of China (PRC): Application of Total Adverse*

*Facts Available for Qingdao Zhengri Seafood Co., Ltd. and Yancheng Yaou Seafood Co., Ltd. in*

*the Preliminary Results of the Admin. Review for the Period Sept. 1, 2000 through Aug. 31, 2001*

at 1 (Sept. 30, 2002) (Public Admin. R. Doc. No. 180); *see Preliminary Results*, 67 Fed. Reg. at

63,878.

In the Preliminary Results, Commerce assigned to the entity Yancheng-Qingdao the

223.01 percent PRC-wide rate, reasoning that the application of adverse facts available was

warranted because part of the single entity, Qingdao, "failed to cooperate to the best of its

ability" by refusing to participate in verification and thereby preventing the verification of record

information of the single entity. *Preliminary Results*, 67 Fed. Reg. at 63,880. Commerce stated

---

[4] Relying on similar grounds, Commerce treated Yancheng and Qingdao as one entity in the prior administrative review, which covered entries of freshwater crawfish tail meat from the PRC entered for consumption from September 1, 1999 through August 31, 2000. *See Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Recision of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19,546, 19,548 (Apr. 22, 2002) ("*1999/2000 POR Final Results*").

that 19 U.S.C. § 1677e(a)(2)(D) "warrants the use of facts otherwise available in reaching a

determination when information is provided, but cannot be verified." *Id.* Commerce reasoned

that because the single entity "did not allow on-site verification of its responses at [Qingdao],

none of the information submitted regarding [Qingdao] could be verified, including its separate

rate information." *Id.*

In the Final Results, Commerce affirmed its findings that Yancheng and Qingdao should

be treated as a single entity and that Qingdao failed to act to the best of its ability to comply with

the Department's requests for information. *Final Results*, 68 Fed. Reg. at 19,506. On the basis

of those findings, Commerce applied facts otherwise available and adverse inferences with

respect to the subject entries of Yancheng. *Id.* Commerce explained that it could not verify the

information submitted by Yancheng as a result of the refusal by Qingdao to fully cooperate in

verification and the submission by Yancheng of improper certifications and contradictory record

data.[5] *Id.* Based on its conclusion that it was unable to determine a separate antidumping duty

assessment rate for the single entity Yancheng-Qingdao, Commerce subjected all entries of

Yancheng's subject merchandise for the period of review to the PRC-wide rate of 223.01

percent. *Id.*

In this action, plaintiffs move for judgment upon the agency record pursuant to USCIT

Rule 56.2. Plaintiffs seek a court-ordered remand to Commerce for correction of the errors

plaintiffs identify in the Final Results.

_____

[5] In the *Preliminary Results*, Commerce concluded that the certifications pertaining to
Qingdao submitted by the single entity "did not comply with the requirements of . . . the
Department's regulations" and that contradictory information was placed on the record regarding
whether Qingdao made any sales of the subject merchandise during the period of review.
*Preliminary Results*, 67 Fed. Reg. at 63,880.

## II. JURISDICTION, STANDING, AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(A) (2000) and 28 U.S.C. § 1581(c) (2000). Having participated as respondents in the administrative review proceeding culminating in the contested determination, China Kingdom, Yancheng, and Qingdao are "interested parties" within the meaning of 19 U.S.C. § 1677(9)(A) (2000) and, therefore, have standing, pursuant to 28 U.S.C. § 2631(c) (2000), to challenge the Department's determination. Under the applicable standard of review, the court must hold unlawful any determination, finding, or conclusion that it finds to be unsupported by substantial evidence on the record or to be otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## III. DISCUSSION

With respect to China Kingdom, the court examines whether Commerce supported its findings with substantial record evidence and acted in accordance with law in applying facts otherwise available and adverse inferences to assign a 223.01 percent assessment rate to entries of China Kingdom's subject merchandise for the period of review. As noted above, Commerce refused at the verification of China Kingdom's producer to accept China Kingdom's attempted submission of production-related data that China Kingdom described as pertaining to the correct period of review. Commerce terminated the verification of China Kingdom's producer. Commerce rejected as untimely China Kingdom's submission of the substitute data.

With respect to Yancheng, the court analyzes whether Commerce supported with substantial record evidence its findings and acted in accordance with law in applying facts otherwise available and adverse inferences in subjecting entries of Yancheng's subject merchandise to the 223.01 percent PRC-wide rate. Commerce made findings, which plaintiffs do

not contest, supporting a conclusion that Yancheng and Qingdao should be treated as a single entity. Commerce further found that Qingdao refused to participate in verification and that Qingdao's refusal to participate rendered unverifiable the information pertaining to Yancheng.

A. Commerce Erred in Applying a 223.01 Percent Assessment Rate to China Kingdom

In their Rule 56.2 motion, plaintiffs argue with respect to China Kingdom that in refusing the corrected data pertaining to Daxin's production and in terminating verification, the Department failed to fulfill its obligation under 19 U.S.C. § 1677b(c) to calculate "the most accurate and representative dumping margin possible." Pls.' Am. Br. at 20- 21 (citing *Shandong Huarong General Corp. v. United States*, 25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001)). According to plaintiffs, Commerce did not support with substantial record evidence its findings that China Kingdom did not timely submit its responses, did not provide verifiable data, and did not act to the best of its ability to comply with the Department's request for information. *Id.* at 4-5, 19-24. They argue that, accordingly, the Department's application of facts otherwise available and adverse inferences, and the assignment of the 223.01 percent assessment rate to entries of China Kingdom's subject merchandise for the period of review, were not supported by substantial record evidence and were not in accordance with law. *See id.* at 5, 24-25. In the alternative, plaintiffs argue that if the record warrants the application of facts otherwise available and adverse inferences, Commerce should have used secondary information to calculate an individual rate for China Kingdom instead of applying the 223.01 percent PRC-wide rate. *Id.* at 26-29.

For the reasons discussed below, the court concludes with respect to China Kingdom that Commerce did not act in accordance with law when invoking facts otherwise available under

subsection (a) of 19 U.S.C. § 1677e and when using adverse inferences under subsection (b) of

that section.  Therefore, the court is unable to sustain the Final Results in assigning to China

Kingdom the resulting 223.01 percent antidumping duty assessment rate.  The court concludes,

in addition, that the 223.01 percent rate is not a reasonably accurate estimate of an actual rate

with respect to entries of China Kingdom's merchandise subject to the review.

### 1.  Commerce Committed Errors In Invoking Facts Otherwise Available under Paragraphs (A) and (B) of 19 U.S.C. § 1677e(a)(2)

Under subsection (a)(1) of § 1677e, the use of facts otherwise available potentially will

occur when "necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).  In

addition, facts otherwise available potentially will be used in the circumstances identified in any

of the four subparagraphs of subsection (a)(2) of the section, which apply when an interested

party or any other person

> (A) withholds information that has been requested by the administering authority . . . under this subtitle,
> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
> (C) significantly impedes a proceeding under this subtitle, or
> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title.

*Id.* § 1677e(a)(2).  If subsection (a)(1) applies, or if one of the four provisions of subsection

(a)(2) applies, "the administering authority and the Commission shall, subject to section

1677m(d) of this title, use the facts otherwise available in reaching the applicable determination

under this subtitle."  *Id.* § 1677e(a).

In the Final Results, Commerce based its resort to facts otherwise available on the same

analysis that it included in the Preliminary Results, stating that "[i]n the *Preliminary Results*, we

applied facts available to China Kingdom pursuant to [19 U.S.C. § 1677e(a)(2)(A) and (B)]

because it failed to provide total production and factors of production for the relevant POR in a

timely manner." *Final Results*, 68 Fed. Reg. at 19,506. The Final Results refer to the discussion

at Comment 7 of the April 14, 2003 decision memorandum ("Decision Memorandum"), which

the Final Results incorporate by reference. *Id.* at 19,505-06; *see also Decision Mem.* at 22-27.

The Final Results also refer the reader, for further details, to an internal memorandum discussing

the application to China Kingdom of facts otherwise available and adverse inferences. *See Final*

*Results*, 68 Fed. Reg. at 19,506; *Freshwater Crawfish Tail Meat from the People's Republic of*

*China (PRC): Application of Total Adverse Facts Available for China Kingdom Import & Export*

*Co., Ltd. in the Preliminary Results of the Administrative Review for the Period 9/1/00 - 8/31/01*

(Sept. 30, 2002) (Public Admin. R. Doc. No. 182) ("*China Kingdom Adverse Facts Available*

*Mem.*").

### a.  Commerce Failed to Make the Requisite Finding In Resorting to Facts Otherwise Available under 19 U.S.C. § 1677e(a)(2)(A)

The court cannot sustain the Department's attempt to base its use of facts otherwise

available on § 1677e(a)(2)(A). Because that provision applies only if "an interested party or any

other person–(A) withholds information that has been requested by the administering authority

. . . under this subtitle," Commerce was required to find that some specifically identified party,

*i.e.*, China Kingdom or some other person, *e.g.*, Daxin, withheld the requested information.

Commerce does not discuss any such finding in the Preliminary Results, the Decision

Memorandum, or the Final Results.[6] Commerce provides no pertinent explanation of what

---

[6] Although directing the reader to the *China Kingdom Adverse Facts Available Mem.* for further discussion, the Final Results do not incorporate the *China Kingdom Adverse Facts*

record evidence would support such a finding and no other explanation of how the requirements

of § 1677e(a)(2)(A) were satisfied in this case.

The Final Results, while citing the Preliminary Results and incorporating the Decision

Memorandum, contain no analysis with respect to § 1677e(a)(2)(A). The Preliminary Results

explain, in a discussion of § 1677e(a)(2)(A) and (B), that "China Kingdom failed to provide total

production and factors of production for the relevant POR in a timely manner." *Preliminary*

*Results*, 67 Fed. Reg. at 63,879. This statement does not constitute a finding that China Kingdom

withheld information. Commerce did not make a finding that China Kingdom, for example,

possessed the substitute Daxin information long before providing it to Commerce on August 8,

2002. Nor is there any finding or discussion of § 1677e(a)(2)(A) as it may have pertained to

Daxin. In the Decision Memorandum, Commerce identified a finding that China Kingdom "failed

to provide verifiable factors of production."[7] *Decision Mem*. at 22. This statement also fails as a

finding that any person withheld information within the meaning of § 1677e(a)(2)(A).

---

*Available Mem.* by reference. Therefore, any discussion of the needed finding and explanation
that may be present in the *China Kingdom Adverse Facts Available Mem.* would not be
sufficient. The court notes, however, that the *China Kingdom Adverse Facts Available Mem.*
does not discuss such a finding and therefore would not suffice for this purpose even if it had
been incorporated by reference.

[7] Despite the reference to verifiability contained in this sentence, Commerce did not find
that the substitute Daxin information was unverifiable for purposes of 19 U.S.C.
§ 1677e(a)(2)(D). Moreover, any such finding would not have been supported by substantial
record evidence. The only pertinent evidence of record demonstrates that the Commerce
verification team in China made no attempt to subject to a verification process the submission
containing the substitute data that China Kingdom described as corresponding to the period of
review. *See China Kingdom Verification Report* at 10. Instead, the Department's verification
team, on the instructions of Commerce officials in Washington, terminated the entire verification
of China Kingdom. *Id.* A deliberate refusal to subject certain factual information to a
verification procedure is not the equivalent of a valid finding that, for purposes of
§ 1677e(a)(2)(D), such information "cannot be verified."

### b. Commerce Erred in Relying on 19 C.F.R. § 351.301(b)(2) for its Resort to Facts Otherwise Available under 19 U.S.C. § 1677e(a)(2)(B)

Commerce expressly invoked 19 C.F.R. § 351.301(b) in finding the substitute information untimely.  The regulation, 19 C.F.R. § 351.301(b), establishes, as a due date for a submission of factual information "[f]or the final results of an administrative review, 140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed."  19 C.F.R. § 351.301(b)(2) (2002).

In its letter of August 28, 2002 to counsel for China Kingdom, Commerce characterized the submission of the substitute Daxin data and counsel's August 14, 2002 follow-up letter as containing "unsolicited new factual information." *Letter Rejecting Information as Untimely* at 1. In the Decision Memorandum, Commerce explained that "in accordance with section 19 CFR 351.301(b)(2) of the Department's regulations, any submission of factual information is due no later than 140 days after the last day of the anniversary month–in this case, January 18, 2002–unless specifically requested by the Department." *Decision Mem.* at 25.  Thus, Commerce concluded that the substitute Daxin information constituted new factual information for purposes of the review and further concluded that this information, having been submitted on August 8, 2002, was untimely given the January 18, 2002 due date set for submissions of such new factual information. *Id.*

The court is not persuaded that the substitute Daxin information constituted what Commerce characterized as "unsolicited new factual information" to render appropriate the application of 19 C.F.R. § 351.301(b)(2). *See Letter Rejecting Information as Untimely* at 1.

Commerce requested the original Daxin production-related information in section D of its questionnaire. *See China Kingdom Questionnaire Resp.*, Section D (setting forth the questions asked in the original questionnaire issued by Commerce). In the Decision Memorandum, Commerce itself described the January 18, 2002 due date as inapplicable where a submission of factual information is "specifically requested by the Department." *Decision Mem.* at 25. The record shows that the information that China Kingdom offered to the Commerce verification team on August 8, 2002 consisted of factual information, and calculations based on factual information, that were needed for the determination of normal value according to 19 U.S.C. § 1677b(c) and that were submitted by China Kingdom solely to correct its earlier response to the Department's questionnaire. *See Letter Rejecting Information as Untimely* at 1. The record contains no evidence establishing or suggesting that China Kingdom submitted the substitute Daxin information for any purpose *other* than to correct the error that occurred when it submitted the incorrect information.

China Kingdom submitted the original Daxin production-related information, which pertained to the incorrect time period, on February 27, 2002 as part of its response to section D of the Department's questionnaire. *China Kingdom Questionnaire Resp.*, Section D. Commerce had approved that date as an extended due date for China Kingdom's questionnaire response. *Letter from Sec'y of Commerce to Garvey Schubert Barer* (Feb. 7, 2002) (Public Admin. R. Doc. No. 47). Commerce, in the Decision Memorandum, appears to adopt the paradoxical position that China Kingdom's submission attempting to correct the February 27, 2002 questionnaire response would not have been timely unless made by January 18, 2002, *i.e.*, more than a month *before* the original information was timely submitted. Under that reasoning, China Kingdom

could never correct the error in its February 27, 2002 questionnaire response, even if it had discovered the error and attempted to correct it immediately.

As discussed later in this Opinion, Commerce appears to have offered contradictory grounds for its conclusion of untimeliness by stating in the Decision Memorandum that "China Kingdom had numerous opportunities to submit the requested information subsequent to the January 18, 2002 regulatory deadline by virtue of the Department's three supplemental questionnaires (issued May 8, June 18, and July 24, 2002), but failed to do so." *Decision Mem.* at 25. The Decision Memorandum does not expressly state that, under this alternate explanation, 19 C.F.R. § 351.301(b)(2) does not apply. However, the Decision Memorandum can be read to indicate that, despite 19 C.F.R. § 351.301(b)(2), the corrected information would have considered to be timely filed had it been submitted with the response to any of the supplemental questionnaires, including the response to the July 24, 2002 supplemental questionnaire, which was due and submitted on July 31, 2002. *Letter from Garvey Schubert Barer to Sec'y of Commerce* (July 31, 2002) (Public Admin. R. Doc. No. 151).

In summary, the court is unable to sustain the Department's reliance on 19 C.F.R. § 351.301(b)(2) as grounds for rejecting as untimely the substitute Daxin information and invoking facts otherwise available under 19 U.S.C. § 1677e(a)(2)(B). Although the court accords substantial deference to the Department's interpretation and application of its own regulations, *see Torrington Co. v. United States*, 156 F.3d 1361, 1363 (Fed. Cir. 1998), the court on the record facts of this case cannot sustain the Department's application of 19 C.F.R. § 351.301(b)(2), in which Commerce mischaracterized the substitute Daxin information as "unsolicited new factual information" and invoked the January 18, 2002 due date established

under § 351.301(b)(2) while inconsistently acknowledging subsequent due dates found nowhere in § 351.301(b)(2).

c.  Because the Substitute Daxin Information Was Submitted After the Questionnaire Phase of the Review, Commerce Did Not Err in Considering the Information Untimely for Purposes of 19 U.S.C. § 1677e(a)(2)(B)

The court next considers whether the Department's finding that China Kingdom's submission of the substitute Daxin information was untimely, although not supported by its reliance on 19 C.F.R. § 351.301(b)(2), is supported by its statement in the Decision Memorandum that "China Kingdom had numerous opportunities to submit the requested information subsequent to the January 18, 2002 regulatory deadline by virtue of the Department's three supplemental questionnaires (issued May 8, June 18, and July 24, 2002), but failed to do so." *Decision Mem.* at 25.  Although the Decision Memorandum expressly discusses 19 C.F.R. § 351.301(b)(2), the court interprets the further discussion in the Decision Memorandum to indicate that Commerce intended the above-quoted statement referring to supplemental questionnaires as a separate reason for its finding that the substitute Daxin information was untimely for purposes of 19 U.S.C. § 1677e(a)(2)(B).

The Department's regulations state generally that Commerce will specify certain information when making a written request to an interested party for a response to a questionnaire:

> (2) *Questionnaire responses and other submissions on request. . . .* (ii) In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the following: the time

limit for the response; the information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit requested information in the requested form and manner by the date specified may result in use of facts available under [19 U.S.C. § 1677e] and [19 C.F.R.] § 351.308.

19 C.F.R. § 351.301(c)(2)(ii); *see* 19 C.F.R. § 351.301(c)(2)(iii) (providing that interested parties will be allowed at least 30 days from the date of receipt to respond to the full initial questionnaire). Commerce did not expressly rely on § 351.301(c)(2) in the Decision Memorandum, and instead, as discussed above, relied principally, and erroneously, on § 351.301(b)(2).

The initial questionnaire sent to China Kingdom is not included in the record of this proceeding, but the inclusion of a questionnaire sent to another party, which includes form language satisfying the notification requirement of § 351.301(c)(2)(ii), suggests that China Kingdom's questionnaire also included the form language. *Letter from Office of AD/CVD Enforcement VII, Import Admin., Dep't of Commerce to Garvey Schubert Barer* at App. I-3, I-4 (Jan. 18, 2002) (Public Admin. R. Doc. No. 37) (setting forth the definition of "Facts Available" and describing the findings required for the application of facts otherwise available and adverse inferences). Moreover, China Kingdom does not raise in this litigation a procedural defect pertaining to the questionnaire. The record contains a letter, dated February 7, 2002, by which Commerce approved China Kingdom's request to extend to February 27, 2002 the February 13, 2002 due date for China Kingdom's response to sections A, C and D of the questionnaire.[8] Based on the record evidence, the court has no basis to conclude that Commerce failed to satisfy

---

[8] Commerce also established due dates and issued extensions for the supplemental questionnaires sent to China Kingdom.

the requirements of § 351.301(c)(2)(ii) to establish an extended due date of February 27, 2002 for the response to that questionnaire and to place China Kingdom on notice that its failure to supply the requested information by the due date for the questionnaire "may result in use of facts available" under 19 U.S.C. § 1677e.  Commerce unquestionably had discretion to extend the due date for the questionnaire response.  *See* 19 C.F.R. § 351.302(b) (2002).  Therefore, Commerce acted within its discretion in determining in the Decision Memorandum that the final, extended due date by which China Kingdom timely could have submitted the substitute Daxin information was in a response to one of the supplemental questionnaires, the last of which, issued on July 24, 2002, had a due date of July 31, 2002.  Because the substitute Daxin information was submitted on August 8, 2002, Commerce did not err in treating the submission of the substitute Daxin information as untimely for purposes of 19 U.S.C. § 1677e(a)(2)(B).

### d.  Commerce Erred in Concluding that 19 U.S.C. § 1677m(d) Did Not Apply Because China Kingdom, Not Commerce, Discovered the Error in the Originally-Submitted Daxin Information

The valid determination by Commerce that China Kingdom's August 8, 2002 submission of the substitute Daxin information was untimely for purposes of 19 U.S.C. § 1677e(a)(2)(B) does not resolve fully the question of whether Commerce acted in accordance with law in disregarding that information in favor of facts otherwise available.  In the instance of a determination under § 1677e(a)(2)(B), the use of facts otherwise available as a substitute for the untimely submitted information is expressly qualified by § 1677m(d).  *See* 19 U.S.C. § 1677e(a) (stating that " . . . the administering authority . . . shall, *subject to section 1677m(d) of this title*, use the facts otherwise available in reaching the applicable determination under this subtitle") (emphasis added).  Section 1677m(d) addresses the situation confronting Commerce at the time

China Kingdom attempted to submit the substitute data. In pertinent part, the section provides

that

> [i]f the administering authority . . . determines that a response to a request for
> information under this subtitle does not comply with the request, the
> administering authority . . . shall promptly inform the person submitting the
> response of the nature of the deficiency and shall, to the extent practicable,
> provide that person with an opportunity to remedy or explain the deficiency in
> light of the time limits established for the completion of . . . reviews under this
> subtitle.

19 U.S.C. § 1677m(d). The section goes on to provide that if the party submits further

information in response to the deficiency, Commerce may disregard that further submission if it

first finds that "such response is not satisfactory" or that "such response is not submitted within

the applicable time limits." 19 U.S.C. § 1677m(d)(1)-(2).

There can be no dispute that, for purposes of § 1677m(d), a "deficiency" existed with

respect to the originally-submitted figure for Daxin's total crawfish tail meat production and with

respect to the originally-submitted calculations for eight of the eleven factors of production that

were affected by the error. It is also apparent from the record–and defendant does not

contest–that China Kingdom submitted "further information in response to such deficiency."

19 U.S.C. § 1677m(d). The question before the court, then, is whether Commerce, in failing to

address the conditions imposed by § 1677m(d), had the authority to "disregard all . . . of the . . .

subsequent responses" in favor of the use of facts otherwise available. *Id*.

During the administrative review, Commerce concluded that it had such authority, stating

that "[b]ecause the Department was unaware of any deficiencies in [China Kingdom's]

production and factors of production information, [§ 1677m(d)] does not apply." *China

Kingdom Adverse Facts Available Mem.* at 4. In the Preliminary Results, Commerce again

concluded that it had no obligation under § 1677m(d) to provide China Kingdom an opportunity to remedy or explain the deficiency.  Commerce reasoned that § 1677m(d) did not apply because "[p]rior to the verification, the Department had no means of determining whether the data came from the relevant POR, and therefore could not inform the respondent that its response was deficient."  *Preliminary Results*, 67 Fed. Reg. at 63,879.  Before the court, defendant argues that § 1677m(d) "limits the opportunity to remedy or explain deficiencies to those which Commerce identifies and [of which it] informs the interested party."  Def.'s Resp. to the Court's Mar. 20, 2006 Questions 9.  According to defendant, "the opportunity to remedy or explain a deficiency described in section 1677m(d) of the statute does not apply to the situation where a respondent, months after making the submission, identifies a deficiency in its submission."  *Id.*

The court finds no merit in the Department's conclusion of law that § 1677m(d) did not apply because Commerce, until being informed of the problem by China Kingdom, was unaware of the deficiency in the originally-submitted total production information and the calculated information pertaining to eight of the eleven factors of production.  Nor is there merit in the parallel argument that defendant makes before the court, *i.e.*, that Commerce was correct in concluding that § 1677m(d) of the statute does not apply if a respondent discloses the factual basis for a finding that its own submission has a deficiency.  The procedure set forth in § 1677m(d) applies "[i]f the administering authority . . . determines that a response to a request for information . . . does not comply with the request . . . ."  19 U.S.C. § 1677m(d).  Commerce, in the course of the administrative review, made exactly that determination with respect to the originally-submitted Daxin information.  That Commerce made the determination of deficiency only after China Kingdom brought the problem to the Department's attention does not support

the Department's conclusion that § 1677m(d) was inapplicable. The fact that Commerce was not the first to discover the error is irrelevant to the Department's obligations under that statutory provision. Section 1677m(d) does not condition those obligations on the manner in which Commerce discovered facts causing it to draw the conclusion of deficiency. Nor does anything in the statute provide that § 1677m(d) is inapplicable if Commerce is unable to discover the deficiency prior to verification.

The court accords deference to the Department's formal statutory constructions. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). Here, however, the court finds no ambiguity or silence in § 1677m(d) that would justify resort to the second step in a *Chevron* analysis. *See Chevron*, 467 U.S. at 842-43 (stating that "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). A construction of § 1677m(d) that renders it inapplicable if the Department was unaware of the deficiency prior to verification cannot be reconciled with the unambiguous legislative intent expressed in the plain language of that provision. Nor does § 1677m(d) excuse Commerce from its obligations if the submitting party, not Commerce, is the first to discover and disclose the facts leading to the Department's determination of deficiency.

e.  Commerce Erred In Failing to Make and Support a Finding under 19 U.S.C. § 1677m(d) that Allowing the Opportunity to Remedy or Explain the Deficiency Would Be Impracticable In Light of the Time Limits for Completing the Administrative Review

Under 19 U.S.C. § 1677m(d), Commerce was required "to the extent practicable" to provide China Kingdom the opportunity to remedy or explain the deficiency "in light of the time limits established for the completion of . . . reviews under this subtitle."  19 U.S.C. § 1677m(d). However, by deciding, based on a misreading of the statute and flawed reasoning, that § 1677m(d) did not apply, Commerce deprived itself of the opportunity to make the finding that § 1677m(d) required.  Specifically, that finding was whether it was "practicable" to allow China Kingdom the opportunity to remedy or explain the deficiency "in light of the time limits established for the completion of . . . reviews . . . ."  *Id.*  The court discerns no finding, and no discussion, on this critical question in the Final Results, which adopt without elaboration the approach announced in the Preliminary Results.  As does the Decision Memorandum, the latter fail to reach the practicability issue because the Department incorrectly concluded that § 1677m(d) had no applicability in the circumstances presented.

The Final Results refer to the analysis in the Decision Memorandum.  *Final Results*, 68 Fed. Reg. at 19,506.  Accordingly, the court considers whether the requisite finding on impracticability is stated in the Decision Memorandum.  The Decision Memorandum contains the following sentence: "Since the information was submitted during verification, instead of in a response to one of the several questionnaires issued to China Kingdom, the Department did not have an opportunity to analyze the information in the context of this review."  *Decision Mem.* at 25.  This sentence is not reasonably construed as an explicit finding that it was impracticable for Commerce to provide China Kingdom the opportunity to remedy or explain the deficiency.  Even

were it deemed to be such a finding, it would not withstand judicial review because it is entirely conclusory. Commerce cited no record evidence, and provided no reasoning, that could have supported the missing finding.

Had Commerce addressed whether it was practicable to allow China Kingdom to remedy or explain the deficiency "in light of the time limits established for the completion of . . . reviews under this subtitle," it would have considered the time remaining according to 19 U.S.C. § 1675(a)(3)(A). 19 U.S.C. § 1677m(d); *see* 19 U.S.C. § 1675(a)(3)(A) (2000). The statute directs Commerce to issue preliminary results within 245 days after the last day of the month in which occurs the anniversary of the date of publication of the order for which the review was requested ("anniversary month"), and final results within 120 days after publication of the preliminary results, with an exception under which Commerce may extend the time periods if meeting these time limits is not practicable. 19 U.S.C. § 1675(a)(3)(A). Under the exception, Commerce may extend the 245-day period to 365 days and the 120-day period to 180 days. *Id.* If the time for issuing the preliminary determination is not extended, the statute allows final results to be issued within 300 days after publication of the preliminary results. *Id.* For this review, the last day of the anniversary month was September 30, 2001. The statute, therefore, established an extended due date of September 30, 2002 for the Department's preliminary results; the Preliminary Results, as published on October 16, 2002, in fact show a date of

decision of September 30, 2002.[9] Similarly, the Commerce determination comprising the Final Results was dated April 14, 2003, which was the 180th day following publication of the Preliminary Results on October 16, 2002.

The record establishes that the substitute information was provided to Commerce on August 8, 2002, the first day of verification taking place at the Daxin facility. Because 53 days remained before the Preliminary Results were due and more than eight months remained before the Final Results were due, no reason is apparent why affording China Kingdom, at the least, the opportunity to explain the deficiency would have been impracticable. Instead of inviting China Kingdom to make a submission explaining the deficiency, as 19 U.S.C. § 1677m(d) required if doing so was practicable, Commerce did the opposite. Commerce rejected and returned to China Kingdom's counsel an unsolicited letter that counsel for China Kingdom submitted on August 14, 2002. *Letter Explaining Deficiency in Prod. Data*. Commerce deemed the letter unacceptable as "unsolicited new factual information" under 19 C.F.R. § 351.301(b)(2). *See Letter Rejecting Information as Untimely* at 1-2. That letter constituted part of China Kingdom's attempted explanation of the deficiency itself. The substance of the letter is contained in three sentences, as follows:

> On behalf of China Kingdom Import & Export Co., Ltd. ("China Kingdom"), we are filing this letter as a follow up to our letter dated August 13, 2002 regarding materials associated with the verification of Chaohu Daxin Foodstuff

---

[9] The Department extended the deadlines pursuant to its statutory authority. *Notice of Extension of Time Limit of Preliminary Results of Antidumping Duty Administrative Review: Freshwater Crawfish Tail Meat From the People's Republic of China*, 67 Fed. Reg. 36,856 (May 28, 2002) (extending until September 30, 2002 the deadline for issuance of the preliminary results); *Freshwater Crawfish Tail Meat From the People's Republic of China: Extension of Time Limit for Final Results of Administrative Antidumping Review*, 68 Fed. Reg. 7345 (Feb. 13, 2003) (extending until April 14, 2003 the deadline for issuance of the final results).

Co., Ltd. ("Daxin"). We wish to state for the record that 7 of a total of 13 containers of subject merchandise shipped by China Kingdom were in fact produced by Daxin in 2000. This formed the basis for reporting 2000 data in Daxin's section D questionnaire response.

*Letter Explaining Deficiency in Prod. Data.* The rejected letter provided information pertinent to the nature of the deficiency and how it occurred, which information Commerce appears to have declined to consider. The rejected information appears relevant to the circumstances of the deficiency because four of the months of the period of review, which was September 1, 2000 through August 31, 2001, occurred in 2000.

Having concluded that 19 U.S.C. § 1677m(d) did not apply, Commerce also avoided making a determination on whether it was practicable, in light of the time remaining before September 30, 2002, to allow China Kingdom the opportunity to remedy or to remedy to some extent, as opposed to the opportunity only to explain, the deficiency. The record indicates that the Commerce verification team was prepared to conduct a verification of the originally-submitted Daxin information on August 8, 2002. *See China Kingdom Verification Report* at 10. From the record and from the Department's stated reasons for discontinuing the entire verification procedure, it is not apparent that a choice to subject the substitute numerical Daxin information to verification, instead of the originally-submitted Daxin information, would have consumed significant additional time. Because the substitute information concerned numerical calculations used in determining normal value based on Daxin's production data, verification and use of that information would not have required Commerce to re-examine all the other information compiled during the review for the determination of China Kingdom's assessment rate. Thus, the Decision Memorandum is unconvincing in its claimed lack of "an opportunity to

analyze the information in the context of this review." *See Decision Mem.* at 25. According to

the Department's own analysis, the substitute Daxin information would have been considered

timely if filed by July 31, 2002 but was untimely as submitted on August 8, 2002. *Id.* Because

of the lack of the requisite finding and a lack of explanation, it is not apparent why a delay of

eight days rendered use of the substitute information impracticable when viewed in the context of

a due date of September 30, 2002 for the Preliminary Results and April 14, 2003 for the Final

Results.

Before the court, defendant argues that "spending additional time at the verification of

China Kingdom . . . would have been at least 'inconvenient'" and that "[a]llowing large new

submissions which change critical portions of a response and requiring that they be evaluated in a

short time span while officials are at verification would make the conduct of verification

extremely burdensome." Def.'s Resp. to the Court's Mar. 20, 2006 Questions 15-16. This post

hoc justification about inconvenience and "large new submissions" does not explain why

subjecting to verification the substitute Daxin information instead of the originally-submitted

Daxin information would have been so burdensome as to make use of the substitute information

impracticable. The proffered corrections involved one figure for total production and eight

calculated figures for various factors of production. Although alluding vaguely to difficulties

arising because verification occurred after the questionnaire phase and remotely from the

Department's headquarters, defendant does not explain satisfactorily in its arguments to the court

how the corrections would "make the conduct of verification extremely burdensome." *Id.*

Moreover, to conclude that verification of the substitute information would have been "extremely

burdensome" begs the question why Commerce did not make a finding of impracticability under § 1677m(d).

Commerce must support with specific factual findings the required determination of practicability under § 1677m(d). Remedying any deficiency in a questionnaire response typically will require submission of new information. A mere finding that the remedy would require Commerce to consider new information is not commensurate with a finding that allowing the interested party to effect the remedy would be impracticable under the circumstances, given the statutory time limits. And it is obvious that Commerce may not avoid conducting the review in full compliance with the statute simply because in some instances it may be inconvenient to do so.

Defendant also argues to the court that verifying and using the substitute information "would be unfair to the petitioners and other interested parties in the proceeding by depriving them of an opportunity to meaningfully comment on China Kingdom's information and preventing Commerce from allocating its resources in a way to ensure the timely completion of the administrative review." Def.'s Resp. to the Court's Mar. 20, 2006 Questions 16. Defendant's argument is unconvincing. As the record shows, the substitute information was offered at the outset of the phase of the China Kingdom verification that was being conducted at Daxin's facility. Again, no reason is apparent from the record why the verification team could not have subjected the substitute information to a verification procedure had it not been ordered to refrain from doing so. When viewed in the context of the time then remaining for completion

of the administrative review and the opportunities to comment that remained for the other parties

participating in the review, defendant's argument is unpersuasive.[10]

Defendant also points to decisions of the Court of International Trade, which it interprets

as upholding the Department's practice of accepting information at verification only if that

information relates to minor adjustments to, or corroboration or clarification of, information

already on the record.  Def.'s Resp. to the Court's Mar. 20, 2006 Questions 6-7 (citing *Chia Far*

*Industrial Factory Co. v. United States*, 28 CIT __, 343 F. Supp. 2d 1344 (2004); *Maui*

*Pineapple Co. v. United States*, 27 CIT 580, 595, 264 F. Supp. 2d 1244, 1257 (2003); *Reiner*

*Brach GmbH & Co. KG v. United States*, 26 CIT 549, 558-60, 206 F. Supp. 2d 1323, 1333-34

(2002); and *Coalition for the Pres. of Am. Brake Drum and Rotor Aftermarket Mfrs v. United*

*States*, 23 CIT 88, 94-95, 44 F. Supp. 2d 229, 237 (1999)).  Commerce, in its letter to China

Kingdom in preparation for verification, stated:

> Please note that *verification is not intended to be an opportunity for submitting*
> *new factual information*.  New information will be accepted at verification only
> when (1) the need for that information was not evident previously, (2) the
> information makes minor corrections to information already on the record, or
> (3) the information corroborates, supports, or clarifies information already on the
> record.  Please provide a list of any corrections to your responses to the verifiers at
> the beginning of verification.  Please note that any such submissions must be filed
> with the Department, and appropriate copies served on interested parties, within
> two business days of the commencement of verification.

---

[10] The Department's regulations provide a ten-day period in which other parties may
rebut, clarify, or correct information submitted by another party.  *See* 19 C.F.R. § 351.301(c).
China Kingdom promptly served the substitute information on counsel for the other parties
according to the procedures governing confidential submissions.  *See Letter With Corrected*
*Exhibits* (requesting that Commerce place on the record the exhibits containing the corrected
information and requesting public comment); *Letter Explaining Deficiency in Prod. Data*
(explaining the reason producer Daxin provided data for the incorrect time period); *see also*
19 U.S.C. § 1677m(g) (requiring Commerce to provide parties a final opportunity to comment on
information on which parties did not have a previous opportunity to comment).

*Letter from Office of AD/CVD Enforcement VII, Import Admin., Dep't of Commerce to Garvey*

*Schubert Barer* at 2 (July 26, 2002) (Public Admin. R. Doc. No. 150); *see also Letter Rejecting*

*Information as Untimely* at 2. In this case, it is not necessary for the court to reach the issue of

whether the policy or practice as stated in the letter is consistent with the statute, including in

particular 19 U.S.C. § 1677m(d). The narrow issue presented is whether the Department's

practice, as stated in the letter and as applied in the subject review, sufficed to excuse Commerce

from making the various individual determinations required by 19 U.S.C. § 1677m(d). The court

concludes that it does not. Even had the practice been promulgated as a regulation–which it was

not–it could not correctly be construed to nullify the procedural requirement unequivocally stated

in § 1677m(d): an interested party situated as was China Kingdom must receive the opportunity

to remedy or explain the deficiency if allowing that opportunity is practicable in light of the

statutory time limits for completing the review. The mere existence of the practice was not a

substitute for the Department's complying with the statute and is not a basis on which Commerce

correctly could have concluded, as it did during the review, that § 1677m(d) had no

applicability.[11] Because this case presents a situation in which Commerce committed specific

errors in applying 19 U.S.C. §§ 1677e(a) and 1677m(d), it presents issues not discussed in the

---

[11] Concerning procedural fairness, the court observes that the practice was not formally communicated to China Kingdom until China Kingdom's receipt of the July 26, 2002 letter. *See Letter from Office of AD/CVD Enforcement VII, Import Admin., Dep't of Commerce to Garvey Schubert Barer* at 2 (July 26, 2002) (Public Admin. R. Doc. No. 150). The record does not indicate when the letter was received by China Kingdom and does not allow the court to conclude that it was received when China Kingdom still had a meaningful opportunity to attempt to correct the deficiency during the questionnaire phase of the review. Had Commerce promulgated the practice as a regulation, China Kingdom at least would have been placed on formal notice of the practice before and during the questionnaire phase of the proceeding.

opinions of the Court of International Trade that defendant cited.  *See* Def.'s Resp. to the Court's Mar. 20, 2006 Questions 6-7.

For the reasons discussed above, the court concludes that Commerce committed legal error in using facts otherwise available without first finding, pursuant to § 1677m(d), that it would be, or would not be, practicable to permit China Kingdom to remedy or explain the deficiency given the time limits for completion of the review.

### f.  Commerce Erred In Failing to Make a Finding under 19 U.S.C. § 1677m(d)(1) or (2)

Because Commerce considered 19 U.S.C. § 1677m(d) inapplicable, Commerce did not make a determination under § 1677m(d)(1) or (2).  Commerce did not determine whether the substitute Daxin information was unsatisfactory under § 1677m(d)(1).  Having refused to subject this information to the verification process, Commerce had no basis on which to make this determination.  Commerce never made a determination under § 1677m(d)(2), *i.e.*, whether the further information submitted in response to such deficiency was "submitted within the applicable time limits."  Having never made a determination whether allowing China Kingdom the opportunity to remedy the deficiency would or would not be practicable, Commerce never made a determination as to when such a remedy must be accomplished.  Because a determination under § 1677m(d)(2) was never made, the court will not presume that Commerce would have made, or permissibly could have made on the specific facts of this case, the same determination that it appears to have made under § 1677e(a)(2)(B), *i.e.*, that the substitute Daxin information was untimely because it was submitted after the close of the questionnaire phase of the review.

The Court of Appeals for the Federal Circuit has emphasized, albeit in a procedural context different from this case, the importance of the Department's allowing the correction of

errors where it is feasible to do so at the preliminary results stage of an administrative review.

*See Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) (stating that "[t]his

court . . . has never discouraged the correction of errors at the preliminary result stage; we have

only balanced the desire for accuracy in antidumping duty determinations with the need for

finality at the final results stage."). In *Timken U.S. Corp.*, the Court of Appeals for the Federal

Circuit also noted the importance of performing a verification, and even a second verification, of

information offered as a correction of record information in an administrative review. *See id.*

at 1354 (commenting disapprovingly on the Department's rejection of information as unverified

when Commerce could have, but did not, subject that information to verification).

  2.  The Court Must Order a Redetermination upon Remand Even Though Commerce, In Using
      Adverse Inferences, Supported With Substantial Record Evidence Its Finding That China
                 Kingdom Did Not Act to the Best of Its Ability

Defendant argues that the court must sustain the Final Results with respect to China

Kingdom because Commerce correctly found that China Kingdom did not act to the best of its

ability in responding to the Department's questionnaires and, therefore, did not satisfy the

standard of 19 U.S.C. § 1677e(b). Defendant argues that Commerce was justified in concluding

that China Kingdom failed to exercise the degree of diligence that § 1677e(b) requires of an

interested party. According to this argument, China Kingdom should have discovered promptly

that the total production and factor of production information supplied to it by Daxin pertained to

the wrong time period and should have corrected the problem long before verification. *See*

*Decision Mem.* at 23-25. Commerce, in the Decision Memorandum, explained that

> China Kingdom should have been able to comply with the Department's requests for information in an accurate and timely manner.  Furthermore, in light of China Kingdom's failure to provide accurate figures for total production and eight of eleven factors of production, and considering the ease with which the failure likely could have been detected, we find that China Kingdom paid insufficient attention to its statutory duty to comply with the Department's requests for information, as did Daxin.

*Id.* at 25.  Defendant argues that the court must sustain the Department's application of § 1677e(b) to reject, as an adverse inference, all of China Kingdom's submitted information.  Defendant directs the court's attention to the decision of the Court of Appeals for the Federal Circuit in *Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003).

China Kingdom asserts that it acted in good faith, arguing that in submitting the incorrect data, "China Kingdom and its producer had no intent to deceive the Department–rather, the data from the incorrect period of review was simply provided in error."  Reply Br. in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R. 5 ("Pls.' Reply").  China Kingdom further argues that it acted to the best of its ability to provide Commerce with the requested information immediately upon discovery of the deficiency.  *Id.*  China Kingdom contends that Commerce, therefore, did not support with substantial record evidence its finding that China Kingdom failed to act to the best of its ability in responding to the Department's request for information.  *Id.* 3-4.

The absence of an intent to deceive Commerce, and China Kingdom's claimed efforts to remedy the deficiency by all means upon discovering it, do not resolve the question of whether China Kingdom acted to the best of its ability in reviewing, and then submitting to Commerce during the questionnaire phase of the review, Daxin's production-related information.  In *Nippon Steel Corp.*, the Court of Appeals for the Federal Circuit upheld the Department's use of adverse inferences where the plaintiff Nippon Steel Corporation ("NSC") initially informed Commerce in

an antidumping investigation that certain data on NSC's sales of subject steel products that

Commerce requested ("conversion factor data") were unavailable but then provided the requested

information three days after the publication of the Department's preliminary less-than-fair-value

determination. 337 F.3d at 1377-78. Describing the standard required of an interested party by

19 U.S.C. § 1677e(b), the Court of Appeals for the Federal Circuit stated that "the statutory

mandate that a respondent act to 'the best of its ability' requires the respondent to do the

maximum it is able to do." *Id.* at 1382.

Were 19 U.S.C. § 1677e(b) properly applied in the Final Results, the court would sustain

under the standard set forth in *Nippon Steel Corp.* the Department's finding that China Kingdom

did not act to the best of its ability in responding to the Department's request for total production

and factor-of-production data pertaining to its producer. *See id.* It does not appear to the court

that China Kingdom disputed the Department's finding that China Kingdom readily could have

discovered and corrected the error during the questionnaire phase, nor do plaintiffs argue before

the court that the deficiency affecting the originally-submitted Daxin information would not have

been apparent upon a closer examination of that information. Commerce reasonably could

expect China Kingdom to review information provided to it by its producer so as to discover a

facially-apparent deficiency before submitting it during the questionnaire phase of the review.

The finding that China Kingdom did not act to the best of its ability for purposes of § 1677e(b),

however, does not justify the Department's use of adverse inferences in the Final Results because

Commerce did not properly invoke its authority to use facts otherwise available according to

§ 1677e(a).

Under § 1677e(b), Commerce may use an inference adverse to the party failing to cooperate to the best of its ability with an information request "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). The problem posed by this case is that Commerce committed legal errors in resorting to facts otherwise available under § 1677e(a). The Department's use of an inference adverse to China Kingdom in selecting from the facts otherwise available under § 1677e(b) cannot be viewed in isolation but must be considered in the context of those legal errors.

As described later in this opinion, Commerce erred further in using facts otherwise available as a substitute for information on the record that was unaffected by the submission of the wrong production-related Daxin information and that was, therefore, in no way disallowed by § 1677e(a). These various errors undermined the two bases, *i.e.*, paragraphs (A) and (B) of § 1677e(a)(2), upon which Commerce invoked facts otherwise available. Therefore, they cannot be considered to be harmless errors such that the court could sustain the Final Results as to China Kingdom. In summary, although the circumstance leading to China Kingdom's challenge to the Final Results arose initially from China Kingdom's error in failing to act to the best of its ability in responding to the Department's information request, the problem posed by this case also resulted in part from the Department's own errors in applying § 1677e(a). For this reason, the court must remand the Final Results to Commerce for a redetermination of the assessment rate to be applied to the entries of China Kingdom's merchandise subject to the administrative review.

### 3.  Commerce Acted Contrary to Law in Assigning to China Kingdom a 223.01 Percent Assessment Rate

In addition to the Department's failure to comply with § 1677m(d), as it relates to

§ 1677e(a), in the Final Results, Commerce acted contrary to law in assigning to China Kingdom

a 223.01 percent assessment rate.  Congress, in amending § 1677e, intended to "block any

temptation by Commerce to overreach reality in seeking to maximize deterrence."  *F.LLI De*

*Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

(reasoning that the corroboration requirement in subsection (c) of 19 U.S.C. § 1677e indicates

the intent of Congress to temper the Department's use of punitive margins and to ensure that

Commerce not "overreach reality" in applying subsections (a) and (b) of § 1677e); *see Ta Chen*

*Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (stating that

"Commerce acts within its discretion so long as the rate chosen has a relationship to the actual

sales information available.").

In the Final Results, Commerce did not confine its use of facts otherwise available and

adverse inferences to fill gaps in the information needed to conduct the administrative review.

Instead, the 223.01 percent rate resulted from the Department's unwarranted refusal to use any of

the information China Kingdom submitted during the administrative review, including

information unrelated to the error affecting the Daxin information.  Such an overly broad method

of applying facts otherwise available and adverse inferences far exceeded the scope of

information subject to valid findings under § 1677e and was therefore contrary to law.  *See*

*Gerber Food (Yunnan) Co. v. United States*, 29 CIT __, __, 387 F. Supp. 2d 1270, 1284-88

(2005) (disallowing the Department's blanket refusal to use any information submitted by

respondents, including information unrelated to the deficiency identified under 19 U.S.C. § 1677e(a)).

The derivation of the 223.01 percent rate illustrates that it bears no relationship to the facts pertaining to China Kingdom's sales of subject merchandise. China Kingdom first participated in the antidumping duty proceeding in a new shipper review. In that review, Commerce determined that China Kingdom was independent of government control and calculated an antidumping duty rate of 57.87 percent for the new shipper period of review, September 1, 1999 through March 31, 2000. *Freshwater Crawfish Tail Meat From the People's Republic of China; Notice of Final Results of Antidumping Duty New Shipper Reviews*, 66 Fed. Reg. 45,002, 45,004 (Aug. 27, 2001). Commerce, upon correction of ministerial errors, revised that rate to 77.30 percent in the amended final results of that review. *Freshwater Crawfish Tail Meat From the People's Republic of China: Amended Final Results of Antidumping Duty New Shipper Reviews*, 66 Fed. Reg. 49,343, 49,344 (Sept. 27, 2001). In the administrative review prior to the subject review, from which Commerce obtained the 223.01 percent rate, almost all individual respondents' rates were much lower than 223.01 percent. The margins ranged from one respondent at approximately ten percent, three respondents in the fortieth percentile, two respondents in the sixtieth percentile, one respondent at approximately 175 percent, and one respondent at 223.01 percent. *1999/2000 POR Final Results*, 67 Fed. Reg. at 19,549. Such a distribution results in a mean and median rate significantly below one hundred percent and much less than the highest margin of 223.01 percent. The Department's applied rate of 223.01 percent is several times higher than respondent's prior rate and several times higher than the rates assigned to almost all other individual respondents.

### 4.  In Its Remand Redetermination, Commerce Must Make Determinations It Failed to Make and May Use Facts Otherwise Available and Adverse Inferences Only to a Limited Extent

Commerce, to the extent possible now that the administrative review is completed, must correct on remand the error it made when it failed to provide China Kingdom the opportunity under 19 U.S.C. § 1677m(d) to remedy or explain the deficiency that occurred upon submission of the incorrect Daxin information.  Because the record establishes that affording China Kingdom an opportunity to submit an explanation would not have delayed the review, Commerce, at the least, must afford China Kingdom the opportunity to provide such an explanation during the remand proceeding and must consider that explanation in fashioning its remand redetermination.  Additionally, because China Kingdom submitted the substitute Daxin information for the specific purpose of remedying the deficiency resulting from the original submission of incorrect Daxin information, Commerce, on remand, must make the determinations that are required by 19 U.S.C. § 1677m(d)(1) or (2), or both, and may reopen the record as necessary for this purpose.[12]

If it is necessary to do so, Commerce on remand may use facts otherwise available for the limited purposes of determining a total amount of Daxin's production during the period of review and recalculating the eight affected factors of production.  For these purposes, Commerce may use, as facts otherwise available, facts already on the record; such facts could include the Daxin information originally submitted with the questionnaire response, even though that information

---

[12] Under its regulations, 19 C.F.R. §§ 351.104(a)(2) and 351.302(d) (2002), Commerce does not use in a determination information that it has returned to a submitter as untimely, which information is retained on the record for limited purposes.  The court is allowing Commerce to reopen the record to admit information to the record as necessary to comply with this Opinion and Order.

pertained in part to the wrong time period. Commerce may reopen the record to admit additional information or to use, as facts otherwise available, some or all of the substitute Daxin information as facts otherwise available, even if a verification, or some other demonstration of the reliability of that information, is not practicable during the remand phase of this proceeding. To whatever extent Commerce relies on secondary information, it must, in compliance with 19 U.S.C. § 1677e(c), corroborate that information from independent sources reasonably at its disposal.

The question that remains is whether, and to what extent, Commerce, in developing its remand redetermination, may use inferences adverse to the interests of China Kingdom in selecting from among the facts otherwise available. Under the statute, Commerce is authorized to do so where, as here, an interested party fails to cooperate to the best of its ability in responding to one of its requests for information and, as a result, the necessary information is not available on the record, § 1677e(a)(1), or is affected by one of the four conditions set forth in 19 U.S.C. § 1677e(a)(2), subparagraphs (A) through (D). As discussed previously, Commerce attempted to invoke subparagraphs (A) and (B) but did not do so lawfully. For purposes of the remand proceeding, the necessary information does not now exist on the record in a form in which it is readily usable by Commerce, *i.e.*, such information has not been subjected to the ordinary verification process and has not otherwise been shown to be reliable. In this respect, the court is confronted with an unusual situation. The unsatisfactory state of the record arose because of the failure of China Kingdom to act to the best of its ability in providing the correct Daxin production-related data in response to the Department's questionnaire. At the same time, the record might not be in the current unsatisfactory state had Commerce complied with

§ 1677m(d) and thus satisfied the requirements that § 1677e(a) imposes on the use of facts

otherwise available.

In misapplying § 1677e(a) and, therefore, also misapplying § 1677e(b), Commerce did

not fulfill its responsibility to ensure the accuracy of the determination of the antidumping duty

assessment rate while inducing compliance. *See Timken Co. v. United States*, 354 F.3d 1334,

1345 (Fed. Cir. 2004) (stating that "Commerce must balance the statutory objectives of finding

an accurate dumping margin and inducing compliance, rather than creating an overly punitive

result" and citing *De Cecco*, 216 F.3d at 1032); *Shakeproof Assembly Components, Div. of Ill.*

*Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *NTN Bearing Corp. v.*

*United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (quoting *Rhone Poulenc, Inc. v. United*

*States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), in stating that "[i]t is the duty of [Commerce] to

determine dumping margins 'as accurately as possible,'" and that "the antidumping laws are

remedial not punitive."); *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir.

1994) (quoting *Rhone Poulenc*, 899 F.2d at 1191, in stating that "[t]he Act sets forth procedures

in an effort to determine margins 'as accurately as possible.'"). In its haste to apply what it terms

"total adverse facts available," Commerce must not ignore this responsibility.

The court concludes that in this unusual circumstance Commerce, to a very limited

extent, may draw adverse inferences in selecting from among the facts otherwise available if it is

necessary to use facts otherwise available. On the subject of the application of adverse

inferences, the Court of Appeals for the Federal Circuit has explained that "the purpose of

section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive,

aberrational, or uncorroborated margins." *De Cecco*, 216 F.3d at 1032. The antidumping duty

rate determined by Commerce must be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Id.* Commerce must confine its selection from among the facts otherwise available, and accordingly also must confine its limited drawing of any adverse inferences, to the deficiency in information resulting from the error occurring upon submission of the Daxin production-related information for the incorrect time period. On remand, Commerce may not fail to use, in calculating an antidumping duty assessment rate for China Kingdom, the information that China Kingdom submitted that was not affected by the error occurring upon submission of the Daxin production-related information for the incorrect time period.[13] For the information it chooses to use, as facts otherwise available, in place of the information affected by China Kingdom's error, Commerce must adhere to its obligation, when choosing from among the facts otherwise available under 19 U.S.C. § 1677e(b), to determine the antidumping duty assessment rate with reasonable accuracy. The use of adverse inferences should suffice to ensure that China Kingdom does not benefit from its own failure to cooperate to the best of its ability, *i.e.*, China Kingdom should not benefit from the use, as facts otherwise available, of information that is more beneficial to it than would have been the use of the actual, albeit unverified, Daxin production-related information. "Commerce's discretion in these matters, however, is not unbounded." *Id.* Therefore, if Commerce is confronted on remand with a situation in which use of any adverse inferences is

---

[13] The record does not indicate, but does not rule out, the possibility that Commerce refused to verify some information submitted by China Kingdom that was unaffected by the error occurring on the submission of the incorrect Daxin information. If that occurred, Commerce may not refuse to use that information in the remand redetermination on the ground that it is unverified. *See Timken U.S. Corp.*, 434 F.3d at 1354. Any failure by Commerce to subject that information to verification was entirely unrelated to the error committed by China Kingdom.

appropriate, Commerce must act reasonably. In crafting a remand redetermination, Commerce must be mindful of the principles underlying *De Cecco* and also, as a matter of fairness, be mindful that the problems that now must be resolved upon remand resulted in part from its own errors. Commerce in good faith must ensure that its determination of an assessment rate for China Kingdom is in no respect "punitive, aberrational, or uncorroborated." *Id.*

B. Commerce Acted According to Law in Subjecting Yancheng's Entries to the PRC-Wide Rate

In their motion for judgment on the agency record, plaintiffs argue generally that Commerce erred in refusing to verify Yancheng's questionnaire responses, erred in finding that Yancheng failed to comply to the best of its ability in responding to the Department's information requests, and therefore also erred in using adverse inferences. Plaintiffs further argue that Commerce acted contrary to law in subjecting Yancheng to the PRC-wide rate instead of determining a separate rate. For the reasons discussed below, the court does not find merit in plaintiffs' arguments with respect to Yancheng.

1. Commerce Acted Lawfully in Refusing to Verify Yancheng's Questionnaire Responses

Regarding the Department's refusal to verify Yancheng's information, plaintiffs argue that Commerce, during an administrative review, is obligated by law to fulfill the underlying objective of 19 U.S.C. § 1677b(c) to calculate for each respondent the most accurate antidumping margin possible and that failure to verify Yancheng's response is an abdication of that obligation. Pls.' Am. Br. at 13. According to plaintiffs,

> [t]his arbitrary abdication of its responsibilities to investigate responses from a
> willing respondent, and the failure to explain precisely why it was not able to
> verify Yancheng Yaou's portions of the responses, particularly with respect to
> Yancheng Yaou's Section A response, which established that it was not controlled
> by the Chinese government and was entitled to a rate other [than] the PRC-wide

rate, do not comport with the law, which requires the Department to fulfill the underlying objective of 19 U.S.C. § 1677b(c)–that is, it must seek to obtain the most accurate dumping margins possible.

*Id.*

Defendant responds that the record supports the treatment of Yancheng and Qingdao as a single entity, that Yancheng was the only willing participant in verification, and that Commerce therefore could not calculate a separate dumping margin for a portion of the single entity's sales. Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Agency R. 14, 17-24. During the review, Commerce concluded that Qingdao's decision not to participate in verification "precludes the Department from conducting a complete verification of the consolidated questionnaire responses. . . . Since it is not possible for the Department to verify only part of the consolidated response, [Commerce] must consider the entire response unverifiable." *See Commerce Resp. to Qingdao Non Participation* at 1.

In the Preliminary Results, Commerce determined that Yancheng and Qingdao "should be treated as a single entity for purposes of [the] administrative review" and cited several reasons as support for this determination.[14] *See Preliminary Results*, 67 Fed. Reg. at 63,878. First, Commerce cited the relationship between Yancheng and Qingdao through "a Hong Kong company that owns significant shares in both companies." *Id.* Second, Commerce noted in the Preliminary Results that the Hong Kong owner consolidated the selling activities of Qingdao with those of Yancheng in January 2000. *See id.* In further support of its decision to treat Yancheng and Qingdao as a single entity, Commerce referenced Yancheng and Qingdao's

---

[14] Commerce also treated Yancheng and Qingdao as a single entity in the prior administrative review. *1999/2000 POR Final Results*, 67 Fed. Reg. at 19,548.

submission of "three consolidated supplemental responses to sections A, C, and D of the Department's questionnaire." *Id.* Commerce continued to treat the two plaintiffs as a single entity in the Final Results. *See Final Results*, 68 Fed. Reg. at 19,506.

Plaintiffs' various arguments concerning the Department's refusal to conduct a verification of Yancheng's information ignore the significance of the Department's determination that, for purposes of the administrative review, Yancheng and Qingdao were to be treated as a single entity.[15] One consequence of that determination was that Yancheng could not receive a rate in the administrative review that was separate from any rate determined for Qingdao. A second consequence was that Qingdao's refusal to allow verification precluded the Department from verifying information sufficient to enable it to determine that the single entity was free of government control. Commerce may well have been able to verify Yancheng's information, including the information in Yancheng's section A response relevant to the issue of whether Yancheng was independent of government control, but doing so would have been pointless. Once Qingdao had notified Commerce that it would not participate in verification, Commerce justifiably concluded that a satisfactory verification directed to the Yancheng-Qingdao entity was impossible. Absent Qingdao's permission, Commerce had no authority to conduct a verification

---

[15] The Department's treating of multiple entities as a single entity, sometimes referred to as "collapsing," has been upheld as a "reasonable interpretation of its statutory mandate." *See, e.g.*, *AK Steel Corp. v. United States*, 22 CIT 1070, 1079-80, 34 F. Supp. 2d 756, 764-65 (1998), *rev'd in part on other grounds*, 226 F.3d 1361 (Fed. Cir. 2000). The purpose of collapsing is to prevent producers from circumventing lawful antidumping duties by channeling production through affiliates to whom Commerce may have assigned a lower antidumping duty rate. *Slater Steels Corp. v. United States*, 27 CIT 1255, 1261, 279 F. Supp. 2d 1370, 1376 (2003). Commerce addresses this concern by assigning a single rate for antidumping duty purposes to those affiliated producers which Commerce determines should be treated as a single entity. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,345-46 (May 19, 1997).

of the questionnaire information Qingdao submitted or the portion of the jointly-submitted information that required examination of Qingdao's business records. In particular, Commerce lacked any permission to undertake to verify the portion of Qingdao's information needed for a determination of whether Qingdao was free of government control. Therefore, Commerce would have lacked verified information upon which it could find the Yancheng-Qingdao entity to be free of government control, regardless of the outcome of any verification that Commerce could have conducted on Yancheng's section A response.

Moreover, during the administrative review, plaintiffs did not challenge the Department's determination to treat Yancheng and Qingdao as a single entity and did not challenge any one of the separate findings of fact supporting that determination. In contesting the Final Results before the court, plaintiffs do not argue in their brief supporting their Rule 56.2 motion that Commerce acted contrary to law in its determination to treat Yancheng and Qingdao as a single entity for purposes of the administrative review. Plaintiffs' brief does not provide a basis from which the court could infer such an argument. Even were there such a basis, the court would be unable to find an exception to the doctrine of exhaustion of administrative remedies that conceivably could support a decision by the court to entertain a judicial challenge to the determination to treat Yancheng and Qingdao as a single entity.[16] *See* Pls.' Am. Br. 12-19; Oral Argument Tr., Oct. 21, 2004.

---

[16] To satisfy the doctrine of exhaustion of administrative remedies, a plaintiff seeking to bring a judicial challenge to an administrative action must show that it either raised an objection to an administrative action during the administrative process or that it qualifies for an exception to the exhaustion principle. *See* 28 U.S.C. §2637(d) (2000) (stating that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

In summary, because the Department's decision to treat Yancheng and Qingdao as a single entity is not challenged in this case, and because that decision rendered meaningless any partial verification of that entity that Commerce was authorized by Yancheng to conduct, the court must reject plaintiffs' argument that Commerce erred in refusing to conduct a verification of Yancheng's responses.

   2.  The Department's Decisions to Resort to Facts Otherwise Available and to Use Adverse
           Inferences as to the Yancheng-Qingdao Entity Were in Accordance with Law

Plaintiffs argue that the Department's application of adverse inferences in the determination of the assessment rate for entries of Yancheng's subject merchandise was not supported by substantial record evidence.  *See* Pls.'s Am. Br. 12-18.  Plaintiffs maintain that Commerce must determine that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information" pursuant to § 1677e(b) and argue that

> a respondent is deemed to have failed to act to [the] best of its ability for purposes
> of drawing adverse inferences under section 1677e(b) only when it either willfully
> refuses to comply with Department requests or when it does not "put forth its
> maximum effort to provide Commerce with full and complete answers to all
> inquiries in an investigation."

*Id.* at 13-14 (quoting *Nippon Steel Corp.*, 337 F.3d at 1382).  According to plaintiffs, Commerce "has not alleged that [Yancheng] willfully withheld information or that its questionnaire responses were willfully incorrect."  *Id.* at 14.  Plaintiffs argue that although Yancheng and Qingdao are sibling companies as a result of a Hong Kong company's common minority interest, Yancheng had no control over Qingdao and could not order Qingdao to participate in verification.  *Id.* at 13-15.  Based on this reasoning, plaintiffs complain that Commerce

committed reversible error by holding Yancheng responsible for the non participation of Qingdao in verification.

Plaintiffs' arguments are misguided. Commerce did not find as a fact, and need not have found, that Yancheng itself failed to cooperate to the best of its ability for purposes of the adverse inference provision of 19 U.S.C. § 1677e(b). Based on its determination to treat Yancheng and Qingdao as a single entity–a determination that is, for the reasons discussed previously, unchallenged in this case–Commerce correctly framed the issues for decision as whether there was a basis to invoke the facts available procedure of § 1677e(a) and whether, for purposes of § 1677e(b), the single entity cooperated to the best of its ability in responding to the Department's request for information. In accordance with § 1677e(a)(2)(D), Commerce concluded that information necessary to the administrative review had been submitted but could not be verified. This conclusion undoubtedly was correct: questionnaire information pertaining in whole or in part to Qingdao could not be verified for the simple reason that Qingdao denied Commerce permission to do so. Commerce, therefore, had sufficient grounds under § 1677e(a)(2)(D) to invoke the facts otherwise available procedure with respect to the unverifiable information. The Department's finding that the single entity comprised of Yancheng and Qingdao did not cooperate to the best of its ability is supported by the uncontested fact that Qingdao refused to participate in the verification process.[17]

_____

[17] Because of the significance of the refusal of Qingdao to participate in verification as a basis for a finding of a failure to cooperate for purposes of § 1677e(b), the court need not reach the issues of whether the allegedly invalid certifications of questionnaire responses, or the allegedly contradictory responses on whether Qingdao made any sales of the subject merchandise during the period of review, provide an additional justification for the Department's drawing adverse inferences in choosing from among the facts otherwise available. *See* Pls.'s Am. Br. 15-16.

3. Commerce Acted in Accordance with Law in Subjecting Yancheng's Entries to the 223.01 Percent PRC-Wide Rate Instead of Determining a Separate Rate

In the subject administrative review, Commerce, as it had in previous reviews involving exports from the PRC, determined a "PRC-wide" rate to serve as the rate that it would apply to the entity comprised of the government of the PRC and all respondents that did not qualify for a separate rate because they failed to demonstrate that they were independent of the control of the PRC government. In this review, Commerce assigned such respondents, as an application of facts otherwise available and adverse inferences, the rate of 223.01 percent, which it characterized as "the highest rate from any segment of this administrative proceeding, which is a rate calculated in the 1999-2000 review." *Final Results*, 68 Fed. Reg. at 19,508. Regarding the determination of the PRC-wide rate, to fulfill the corroboration requirement of § 1677e(c), Commerce stated that "[t]he information used in calculating this margin was based on sales and production data of a respondent in a prior review, together with the most appropriate surrogate value information available to the Department, chosen from submissions by the parties in that review, as well as gathered by the Department itself." *Id.*

In challenging the Department's application of the PRC-wide rate to Yancheng as an exercise of authority under 19 U.S.C. § 1677e, plaintiffs, in support of their Rule 56.2 motion, do not raise arguments specifically challenging the manner in which Commerce determined that the 223.01 percent rate was appropriate for assignment to the PRC-wide entity. Instead, plaintiffs argue that even if Commerce is authorized to invoke its authority to use facts otherwise available and adverse inferences as to Yancheng, Yancheng is entitled to its own separate rate and that "[t]he punitive PRC-wide rate certainly is not representative of [Yancheng's] subject sales."

Pls.' Am. Br. 18. Plaintiffs cite *De Cecco*, 216 F.3d at 1032, for the principle that Commerce may not select an unreasonably high rate with no relationship to a respondent's actual dumping margin. *Id.* at 18-19. Plaintiffs submit that the Department was required to craft a duty rate for Yancheng that reflects as precisely as possible Yancheng's actual margin. *Id.* at 18. They argue that Yancheng's unverified "responses provide a reasonable basis on which to calculate a dumping margin that more realistically reflects [Yancheng's] circumstances and operations than the PRC country-wide rate." *Id.* at 19.

However, the Department was well within its authority in refusing to determine an actual assessment rate for Yancheng absent the opportunity to verify Qingdao's information. Yancheng's "circumstances and operations" could not be considered apart from those of Qingdao on the administrative record of this case. The findings of fact on which Commerce relied in treating the two entities as one for purposes of the review, which findings plaintiffs do not contest, support the Department's conclusion that it could not analyze Yancheng's sales operations separately from Qingdao's. In relying on *De Cecco*, 216 F.3d at 1032, to argue that Commerce may not select for Yancheng an unreasonably high rate with no relationship to a respondent's actual dumping margin, plaintiffs fail to explain how the concept of an "actual dumping margin" has meaning given the absence of verified information on the administrative record of this case from which Commerce could have calculated a separate rate for the Yancheng-Qingdao entity. In this respect, the arguments that plaintiffs advance against the assignment to Yancheng of the PRC-wide rate suffer from the same flaw as their other arguments on behalf of Yancheng; *i.e.*, plaintiffs fail to address the full consequences of the Department's decision to treat Yancheng and Qingdao as a single entity. Not only did the record lack verified

information from which an actual assessment rate could have been determined for this entity, it

lacked verified information upon which it could be concluded that the Yancheng-Qingdao entity

was free of government control.

Moreover, with respect to the assignment of the 223.01 percent PRC-wide rate to entries

of Yancheng's subject merchandise as an application of facts otherwise available and adverse

inferences, the court notes that Commerce has not assigned to an entity comprised of Yancheng

and Qingdao an individual assessment rate in any previous investigation or review.[18]  Yancheng

and Qingdao were first treated as a single entity in the prior administrative review, for which the

period of review was September 1, 1999 through August 31, 2000, and in which the single entity

Yancheng-Qingdao was assigned the PRC-wide rate of 223.01 percent.  *1999/2000 POR Final*

---

[18] In the antidumping investigation, Yancheng Baolong Aquatic Foods Co., Ltd. ("Yancheng Baolong Aquatic"), which later became known as Yancheng, obtained a separate rate of 122.92 percent.  *Order*, 62 Fed. Reg. at 48,219.  In the administrative review for the period of March 26, 1997 through August 31, 1998, Yancheng Baolong Aquatic was included in the PRC-wide rate of 201.63 percent.  *Freshwater Crawfish Tail Meat From the People's Republic of China: Final Results of Administrative Antidumping Duty and New Shipper Reviews, and Final Rescission of New Shipper Review*, 65 Fed. Reg. 20,948, 20,949 (Apr. 19, 2000).  In the administrative review for the period September 1, 1998 through August 31, 1999, Yancheng Baolong Aquatic did not respond to the Department's questionnaire and again was treated as a government-controlled enterprise subject to the PRC-wide rate of 201.63 percent.  *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review and New Shipper Reviews, and Final Partial Rescission of Antidumping Duty Administrative Review*, 66 Fed. Reg. 20,634, 20,634-35 (Apr. 24, 2001) ("*1998/1999 POR Final Results*"); *Notice of Preliminary Results of Antidumping Duty Administrative Review and New Shipper Reviews, Partial Rescission of the Antidumping Duty Administrative Review, and Rescission of a New Shipper Review: Freshwater Crawfish Tail Meat From the People's Republic of China*, 65 Fed. Reg. 60,399, 60,401 (Oct. 11, 2000) ("*1998/1999 POR Preliminary Results*").  For the same period of review, September 1, 1998 through August 31, 1999, Commerce conducted a new shipper review for Qingdao, determined that Qingdao was independent of government control, and calculated a separate rate of 0.00 percent.  *1998/1999 POR Final Results*, 66 Fed. Reg. at 20,635; *1998/1999 POR Preliminary Results*, 65 Fed. Reg. at 60,399, 60,402-03.

*Results*, 67 Fed. Reg. at 19,548-49. Upon a judicial challenge to the final results of that previous review, the Court of International Trade affirmed the Department's treatment of Yancheng and Qingdao as a single entity and the inclusion of the Yancheng-Qingdao entity in the PRC-wide rate for that administrative review. *Crawfish Processors Alliance v. United States*, 28 CIT __, __, 343 F. Supp. 2d 1242, 1269-70 (2004), *rev'd on other grounds*, 477 F.3d 1375 (Fed. Cir. 2007). Thus, in applying facts otherwise available and using adverse inferences, Commerce was faced with a situation in which the Yancheng-Qingdao entity had not received, in any prior phase of the antidumping proceedings, a separate rate that could serve even as a comparison.

In summary, plaintiffs do not specifically challenge the methodology Commerce applied in selecting the 223.01 percent rate as the PRC-wide rate, nor do they challenge the decision to treat Yancheng and Qingdao as a single entity or the findings of fact on the basis of which Commerce did so. The court concludes that Commerce acted according to law in declining to assign a separate rate to the Yancheng-Qingdao entity, which had failed to establish its independence from government control, and for which no verified record information existed from which a separate rate could have been calculated.

## IV. CONCLUSION AND ORDER

The court concludes that the Department's determination in the Final Results to assign to China Kingdom the antidumping duty assessment rate of 223.01 percent is not in accordance with law because (1) Commerce failed to make a finding that any specific person withheld requested information for purposes of 19 U.S.C. § 1677e(a)(2)(A); (2) Commerce failed to make and support with substantial record evidence necessary findings under 19 U.S.C. § 1677e(a)(2)(B) and did not afford China Kingdom the opportunity to remedy or explain the

deficiency occurring upon the submission of corrective information; (3) Commerce erred in

relying on 19 C.F.R. § 351.301(b)(2) when invoking authority to use facts otherwise available

under 19 U.S.C. § 1677e(a)(2)(B); (4) Commerce erred in disregarding certain information

submitted by China Kingdom that was not deficient under 19 U.S.C. § 1677e(a); and

(5) Commerce did not act in accordance with law in assigning to China Kingdom an assessment

rate that was not reasonably related to an actual assessment rate relevant to the entries of China

Kingdom.

The court concludes that the Department's determination in the Final Results to subject

the entries of Yancheng to the 223.01 percent PRC-wide rate is supported by substantial evidence

and is otherwise in accordance with law.

For the reasons stated in this Opinion and Order, plaintiff's motion for judgment on the

agency record is granted in part and denied in part, and it is hereby

**ORDERED** that this matter is remanded to the United States Department of Commerce
for further administrative proceedings consistent with this Opinion and Order; it is further

**ORDERED** that Commerce, on remand, issue a remand redetermination that calculates
and assigns to China Kingdom a new antidumping duty assessment rate that is in full compliance
with all directives in this Opinion and Order; it is further

**ORDERED** that Commerce, in the remand redetermination ordered hereunder, support
all findings with substantial record evidence and include a reasoned explanation for its
determinations; it is further

**ORDERED** that Commerce, in developing the remand redetermination required
hereunder, make the determination as to practicability that is required by 19 U.S.C. § 1677m(d)
to the extent possible now that the review is completed and, in so doing, specifically must afford
China Kingdom a reasonable opportunity to explain the deficiency affecting the information on
Daxin's total production during the period of review and the calculated data for eight of the
eleven factors of production, as submitted in the February 27, 2002 questionnaire response, and
may reopen the administrative record as necessary to comply with these directives; it is further

**ORDERED** that Commerce, in developing the remand redetermination required hereunder, make the specific determinations required by 19 U.S.C. § 1677m(d)(1) or (2), or both, with respect to the substitute Daxin information that China Kingdom submitted for the specific purpose of remedying the deficiency existing as a result of the original submission of incorrect Daxin information, and may reopen the administrative record as necessary to comply with these directives; it is further

**ORDERED** that Commerce, in developing the remand redetermination required hereunder, may use facts otherwise available solely to determine the total amount of Daxin's production of subject merchandise during the period of review and to calculate and to determine the eight of the eleven factors of production affected by the error occurring upon the reporting of the originally-submitted Daxin information and, in so doing, may reopen the administrative record as necessary to comply with these directives; it is further

**ORDERED** that Commerce, in developing the remand redetermination required hereunder, in selecting from among facts otherwise available may use adverse inferences only to the limited extent authorized in this Opinion and Order and in its remand redetermination must state to the court, and must demonstrate with substantial record evidence and reasoned explanation, that its limited use of adverse inferences is not punitive, aberrational, or uncorroborated; and it is further

**ORDERED** that Commerce complete and file its remand redetermination on or before January 4, 2008; plaintiffs shall have thirty (30) days from that filing to file comments; and Commerce shall have twenty (20) days after plaintiffs' comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: September 4, 2007
New York, New York